OPINION OF THE COURT
Titone, J.
Are the elements of New York’s causes of action for strict products liability and breach of implied warranty always coextensive? If not, can the latter be broader than the former? These are the core issues presented by the questions that the United States Court of Appeals for the Second Circuit has certified to us in this diversity action involving an allegedly defective vehicle. On the facts set forth by the Second Circuit, we hold that the causes of action are not identical and that, under the circumstances presented here, it is possible to be liable for breach of implied warranty even though a claim of strict products liability has not been satisfactorily established.
L
As stated by the Second Circuit, this action arises out of a June 9, 1986 accident in which plaintiff Nancy Denny was severely injured when the Ford Bronco II that she was driving rolled over. The rollover accident occurred when Denny slammed on her brakes in an effort to avoid a deer that had walked directly into her motor vehicle’s path. Denny and her spouse sued Ford Motor Co., the vehicle’s manufacturer, asserting claims for negligence, strict products liability and breach of implied warranty of merchantability (see, UCC 2-314 [2] [c]; 2-318). The case went to trial in the District Court for the Northern District of New York in October of 1992.
*252 The trial evidence centered on the particular characteristics of utility vehicles, which are generally made for off-road use on unpaved and often rugged terrain. Such use sometimes necessitates climbing over obstacles such as fallen logs and rocks. While utility vehicles are traditionally considerably larger than passenger cars, some manufacturers have created a category of down-sized "small” utility vehicles, which are designed to be lighter, to achieve better fuel economy and, presumably, to appeal to a wider consumer market. The Bronco II in which Denny was injured falls into this category.
Plaintiffs introduced evidence at trial to show that small utility vehicles in general, and the Bronco II in particular, present a significantly higher risk of rollover accidents than do ordinary passenger automobiles. Plaintiffs’ evidence also showed that the Bronco II had a low stability index attributable to its high center of gravity and relatively narrow track width. The vehicle’s shorter wheel base and suspension system were additional factors contributing to its instability. Ford had made minor design changes in an effort to achieve a higher stability index, but, according to plaintiffs’ proof, none of the changes produced a significant improvement in the vehicle’s stability.
Ford argued at trial that the design features of which plaintiffs complained were necessary to the vehicle’s off-road capabilities. According to Ford, the vehicle had been intended to be used as an off-road vehicle and had not been designed to be sold as a conventional passenger automobile. Ford’s own engineer stated that he would not recommend the Bronco II to someone whose primary interest was to use it as a passenger car, since the features of a four-wheel-drive utility vehicle were not helpful for that purpose and the vehicle’s design made it inherently less stable.
Despite the engineer’s testimony, plaintiffs introduced a Ford marketing manual which predicted that many buyers would be attracted to the Bronco II because utility vehicles were "suitable to contemporary life styles” and were "considered fashionable” in some suburban areas. According to this manual, the sales presentation of the Bronco II should take into account the vehicle’s "suitability] for commuting and for suburban and city driving.” Additionally, the vehicle’s ability to switch between two-wheel and four-wheel drive would "be particularly appealing to women who may be concerned about driving in snow and ice with their children.” Plaintiffs both testified that *253 the perceived safety benefits of its four-wheel-drive capacity were what attracted them to the Bronco II. They were not at all interested in its off-road use.
At the close of the evidence, the District Court Judge submitted both the strict products liability claim and the breach of implied warranty claim, despite Ford’s objection that the two causes of action were identical. With respect to the strict products liability claim the court told the jury that "[a] manufacturer who places a product on the market in a defective condition is liable for injury which results from use of the product when the product is used for its intended or reasonably foreseeable purpose.” Further, the court stated:
"A product is defective if it is not reasonably safe. * * * It is not necessary for the plaintiffs to prove that the defendant knew or should have known of the product[’]s potential for causing injury to establish that the product was not reasonably safe. Rather, the plaintiffs must prove by a preponderance of the evidence that a reasonable person * * * who knew of the product’s potential for causing injury and the existence of available alternative designs * * * would have concluded that such a product should not have been marketed in that condition. Such a conclusion should be reached after balancing the risks involved in using the product against the product[’]s usefulness and its costs against the risks, usefulness and costs of the alternative design as compared to the product defendant did market.”
With respect to the breach of implied warranty claim, the court told the jury:
"The law implies a warranty by a manufacturer which places its product on the market that the product is reasonably fit for the ordinary purpose for which it was intended. If it is, in fact, defective and not reasonably fit to be used for its intended purpose, the warranty is breached.
"The plaintiffs claim that the Bronco II was not fit for its ordinary purpose because of its alleged *254 propensity to rollover and lack of warnings to the consumer of this propensity.”[1]
Neither party objected to the content of these charges.
In response to interrogatories, the jury found that the Bronco II was not "defective” and that defendant was therefore not liable under plaintiffs’ strict products liability cause of action. However, the jury also found that defendant had breached its implied warranty of merchantability and that the breach was the proximate cause of Nancy Denny’s injuries. Following apportionment of damages, plaintiff was awarded judgment in the amount of $1.2 million.
Ford subsequently moved for a new trial under rule 59 (a) of the Federal Rules of Civil Procedure, arguing that the jury’s finding on the breach of implied warranty cause of action was irreconcilable with its finding on the strict products liability claim. The trial court rejected this argument, holding that it had been waived and that, in any event, the verdict was not inconsistent.
On defendant’s appeal, a majority at the Second Circuit held that defendant’s trial conduct had not resulted in a waiver of the inconsistency issue. Reasoning that the outcome of the appeal depended upon the proper application of New York law, the court certified the following questions for consideration by this Court pursuant to article VI, § 3 (b) (9) of the State Constitution and rule 500.17 of the Rules of the Court of Appeals (22 NYCRR 500.17): (1) whether the strict products liability claim and the breach of implied warranty claim are identical; (2) whether, if the claims are different, the strict products liability claim is broader than the implied warranty claim and encompasses the latter; and (3) whether, if the claims are different and a strict liability claim may fail while an implied warranty claim succeeds, the jury’s finding of no product defect is reconcilable with its finding of a breach of warranty.
II
In this proceeding, Ford’s sole argument is that plaintiffs’ strict products liability and breach of implied warranty causes of action were identical and that, accordingly, a defendant’s verdict on the former cannot be reconciled with a plaintiff’s verdict on the latter. This argument is, in turn, premised on both the intertwined history of the two doctrines and the close *255 similarity in their elements and legal functions. Although Ford recognizes that New York has previously permitted personal injury plaintiffs to simultaneously assert different products liability theories in support of their claims (see, Victorson v Bock Laundry Mach. Co., 37 NY2d 395, 400), it contends that the breach of implied warranty cause of action, which sounds in contract, has been subsumed by the more recently adopted, and more highly evolved, strict products liability theory, which sounds in tort. Ford’s argument has much to commend it. However, in the final analysis, the argument is flawed because it overlooks the continued existence of a separate statutory predicate for the breach of warranty theory and the subtle but important distinction between the two theories that arises from their different historical and doctrinal root.
When products liability litigation was in its infancy, the courts relied upon contractual warranty theories as the only existing means of facilitating economic recovery for personal injuries arising from the use of defective goods (e.g., Mendel v Pittsburgh Plate Glass Co., 25 NY2d 340, overruled on other grounds Victorson v Bock Laundry Mach. Co., supra; Blessington v McCrory Stores Corp., 305 NY 140; see, Heller v U. S. Suzuki Motor Corp., 64 NY2d 407, 410). Citing statutory authority (UCC 2-314, 2-715 [2] [b]; former Personal Property Law § 96 [1]), the courts posited the existence of an implied warranty arising as an incident of the product’s sale and premised a cause of action for consequential personal injuries based on breaches of that warranty (see, Heller v U. S. Suzuki Motor Corp., supra, at 410).
Eventually, the contractually based implied warranty theory came to be perceived as inadequate in an economic universe that was dominated by mass-produced products and an impersonal marketplace. Its primary weakness was, of course, its rigid requirement of a relationship of privity between the seller and the injured consumer — a requirement that often could not be satisfied (see, Martin v Dierck Equip. Co., 43 NY2d 583, 589-590). Some courts (including ours) recognized certain narrow exceptions to the privity requirement in an effort to avoid the doctrine’s harsher effects (e.g., Greenberg v Lorenz, 9 NY2d 195; see, Heller v U. S. Suzuki Motor Corp., supra, at 410; Prosser and Keeton, Torts § 96, at 682 [5th ed]). However, the warranty approach remained unsatisfactory, and the courts shifted their focus to the development of a new, more flexible tort cause of action: the doctrine of strict products liability (Martin v Dierck Equip. Co., supra, at 590; Micallef v Miehle Co., 39 NY2d 376; Victorson v Bock Laundry Mach. Co., supra, *256 at 402; see, Codling v Paglia, 32 NY2d 330; Goldberg v Kollsman Instrument Corp., 12 NY2d 432, 436; see also, MacPherson v Buick Motor Co., 217 NY 382).
The establishment of this tort remedy has, as this Court has recognized, significantly diminished the need to rely on the contractually based breach of implied warranty remedy as a means of compensating individuals injured because of defective products (see, Heller v U. S. Suzuki Motor Corp., supra, at 411; Martin v Dierck Equip. Co., supra, at 590). Further, although the available defenses and applicable limitations principles may differ, there is a high degree of overlap between the substantive aspects of the two causes of action (see, Victorson v Bock Laundry Mach. Co., supra, at 405). Indeed, on an earlier occasion, this Court observed, in dictum, that "strict liability in tort and implied warranty in the absence of privity are merely different ways of describing the very same cause of action” (Mendel v Pittsburgh Plate Glass Co., supra, at 345; accord, Gumbs v International Harvester, 718 F2d 88 [3d Cir]; Sterno Aero AB v Page Airmotive, 499 F2d 709, 712 [10th Cir]; Larsen v Pacesetter Sys., 74 Haw 1, 837 P2d 1273; 1 Frumer and Friedman, Products Liability § 2.03, at 2-28; 2 Frumer, op. cit., § 9.04 [1], at 9-42, 9-44; Clark and Smith, Product Warranties Tí 12.03 [1], at 12-7).
Nonetheless, it would not be correct to infer that the tort cause of action has completely subsumed the older breach of implied warranty cause of action or that the two doctrines are now identical in every respect (see, Di Prospero v Brown & Sons, 110 AD2d 250, 251). The continued vitality of the warranty approach is evidenced by its retention and expansion in New York’s version of the Uniform Commercial Code (UCC 2-314 [2] [c]; 2-318). The existence of this statutory authority belies any argument that the breach of implied warranty remedy is a dead letter (see, Heller v U. S. Suzuki Motor Corp., supra, at 411-412).[2]
Although the products liability theory sounding in tort and the breach of implied warranty theory authorized by the UCC coexist and are often invoked in tandem, the core element of "defect” is subtly different in the two causes of action. Under *257 New York law, a design defect may be actionable under a strict products liability theory if the product is not reasonably safe. Since this Court’s decision in Voss v Black & Decker Mfg. Co. (59 NY2d 102, 108), the New York standard for determining the existence of a design defect has required an assessment of whether "if the design defect were known at the time of manufacture, a reasonable person would conclude that the utility of the product did not outweigh the risk inherent in marketing a product designed in that manner” (see also, Cover v Cohen, 61 NY2d 261, 270; Robinson v Reed-Prentice Div. of Package Mach. Co., 49 NY2d 471, 479). This standard demands an inquiry into such factors as (1) the product’s utility to the public as a whole, (2) its utility to the individual user, (3) the likelihood that the product will cause injury, (4) the availability of a safer design, (5) the possibility of designing and manufacturing the product so that it is safer but remains functional and reasonably priced, (6) the degree of awareness of the product’s potential danger that can reasonably be attributed to the injured user, and (7) the manufacturer’s ability to spread the cost of any safety-related design changes (Voss v Black & Decker Mfg. Co., supra, at 109). The above-described analysis is rooted in a recognition that there are both risks and benefits associated with many products and that there are instances in which a product’s inherent dangers cannot be eliminated without simultaneously compromising or completely nullifying its benefits (see, Prosser and Keeton, op. cit, § 99, at 699). In such circumstances, a weighing of the product’s benefits against its risks is an appropriate and necessary component of the liability assessment under the policy-based principles associated with tort law.
The adoption of this risk/utility balance as a component of the "defectiveness” element has brought the inquiry in design defect cases closer to that used in traditional negligence cases, where the reasonableness of an actor’s conduct is considered in light of a number of situational and policy-driven factors.[3] While efforts have been made to steer away from the fault- *258 oriented negligence principles by characterizing the design defect cause of action in terms of a product-based rather than a conduct-based analysis (see, e.g., Voss v Black & Decker Mfg. Co., supra, at 107; Barker v Lull Eng’g Co., 20 Cal 3d 413, 418, 573 P2d 443; Prosser and Keeton, op. cit., § 96, at 689), the reality is that the risk/utility balancing test is a "negligence-inspired” approach, since it invites the parties to adduce proof about the manufacturer’s choices and ultimately requires the fact finder to make "a judgment about [the manufacturer’s] judgment” (Birnbaum, Unmasking the Test for Design Defect: From Negligence [to Warranty] to Strict Liability to Negligence, 33 Vand L Rev 593, 610, 648; see, e.g., Sage v FairchildSwearingen Corp., 70 NY2d 579, 587; cf., Enright v Lilly & Co., 77 NY2d 377, 387 [failure to warn claim "though * * * couched in terms of strict liability, is indistinguishable from a negligence claim”]). In other words, an assessment of the manufacturer’s conduct is virtually inevitable, and, as one commentator observed, "[i]n general, * * * the strict liability concept of 'defective design’ [is] functionally synonymous with the earlier negligence concept of unreasonable designing” (Schwartz, New Products, Old Products, Evolving Law, Retroactive Law, 58 NYU L Rev 796, 803, citing United States v Carroll Towing Co., 159 F2d 169, 173 [Hand, J.]; see, e.g., Gauthier v AMF, Inc., 788 F2d 634, 637 [9th Cir] [Mont law]; Birchfield v International Harvester Co., 726 F2d 1131, 1139 [6th Cir] [Ohio law]; St. Germain v Husqvarna Corp., 544 A2d 1283, 1285 [Me]; 1 Frumer and Friedman, op. cit., § 2.02, at 2-14 — 2-16; § 2.04, at 2-35 — 2-36; Henderson and Twerski, Doctrinal Collapse in Products Liability: The Empty Shell of Failure to Warn, 65 NYU L Rev 265, 271-272).
It is this negligence-like risk/benefit component of the defect element that differentiates strict products liability claims from UCC-based breach of implied warranty claims in cases involving design defects. While the strict products concept of a product that is "not reasonably safe” requires a weighing of the product’s dangers against its over-all advantages, the UCC’s concept of a "defective” product requires an inquiry only into whether the product in question was "fit for the ordinary purposes for which such goods are used” (UCC 2-314 [2] [c]).[4] The latter inquiry focuses on the expectations for the perfor *259 manee of the product when used in the customary, usual and reasonably foreseeable manners. The cause of action is one involving true "strict” liability, since recovery may be had upon a showing that the product was not minimally safe for its expected purpose — without regard to the feasibility of alternative designs or the manufacturer’s "reasonableness” in marketing it in that unsafe condition.
This distinction between the "defect” analysis in breach of implied warranty actions and the "defect” analysis in strict products liability actions is explained by the differing etiology and doctrinal underpinnings of the two distinct theories. The former class of actions originates in contract law, which directs its attention to the purchaser’s disappointed expectations; the latter originates in tort law, which traditionally has concerned itself with social policy and risk allocation by means other than those dictated by the marketplace.
The dissent takes issue with the foregoing conclusion, arguing, in essence, that any residual distinction that exists between the two causes of action should be eliminated and that the analysis for "defect” in implied warranty claims should be deemed to encompass the risk/utility analysis that has previously been incorporated in tort causes of action. This argument is predicated on the dissent’s view that the common history of the two causes of action and the perceived advantages of risk/ utility analysis counsel in favor of the use of a unitary standard. The dissent has even gone so far as to suggest that the breach of implied warranty cause of action should be treated like a tort claim despite the fact that it is based on the provisions of the Uniform Commercial Code.
What the dissent overlooks is that, as long as that legislative source of authority exists, we are not free to merge the warranty cause of action with its tort-based sibling regardless of whether, as a matter of policy, the contract-based warranty claim may fairly be regarded as a historical relic that no longer has any independent substantive value. Rather, we must construe and apply this separate remedy in a manner that remains consistent with its current roots in contract law (see, Codling v Paglia, supra [recognizing a tort cause of action to avoid stretching the breach of implied warranty theory to the point where it no longer reflects its origin as part of the bargain between the consumer and seller]).
*260 To the extent that the dissent advocates a merger of the common-law and statutory causes of action through the use of a single analytical standard, its argument is undermined by an examination of what other jurisdictions have done. In most of the cases where the courts have pronounced the merger of breach of warranty with the other products liability theories sounding in tort, they were relying on specific State statutory schemes that were enacted to govern products liability litigation, contain express preemptive language and also specifically define "product liability claim” as one encompassing breach of express or implied warranty as well as negligence and strict liability in tort (see, e.g., Philpott v Robbins Co., 710 F2d 1422 [applying Ore Rev Stat § 30.905]; Chamberlain v Schmutz Mfg. Co., 532 F Supp 588 [applying Kan Stat Ann § 60-3301]; Daily v New Britain Mach. Co., 200 Conn 562, 512 A2d 893 [applying Conn Gen Stat Ann § 52-572m]; Washington Water Power Co. v Graybar Elec. Co., 112 Wash 2d 847, 774 P2d 1199 [applying Wash Rev Code Ann § 7.72.010]; see also, McWilliams v Yamaha Motor Corp., 780 F Supp 251, revd on other grounds 987 F2d 200; but see, Grinnel v Pfizer & Co., 21A Cal App 2d 424, 432, 79 Cal Rptr 369). Indeed, the proposed Model Uniform Product Liability Act, which was issued by the Commerce Department in 1979 (reprinted in 3B Frumer and Friedman, op. cit., Appendix B; see, 44 Fed Reg 62721), embodies precisely the kind of doctrinal merger that the dissent advocates. New York, of course, has not adopted the Model Act or any other such unifying measures.[5]
Contrary to the dissent’s suggestion, the current version of UCC 2-318 is not the equivalent of these uniform product liability provisions, nor does it manifest an intention by our State’s Legislature to engraft a tort cause of action onto a UCC article that concerns itself principally with the contract-based obligations (see, dissenting opn, at 272). Indeed, the Law Revision Commission Staff Notes, which the dissent cites, clearly state that the proposed amendments to UCC 2-318 "would * * * allow recovery by the [strict products liability] plaintiffs on a different cause of action” (Bill Jacket, L 1975, ch 774, Mem of NY Law Rev Commn, Staff Notes relating to A-3070 [emphasis supplied]). Similarly, the Sponsoring Memorandum on which the dissent relies states that the bill’s purpose was to *261 "extend more intelligently the warranty provided to a purchaser of goods under the UCC” (Mem of Assemblyman Silverman, reprinted in 1975 NY Legis Ann, at 110). In fact, it is evident from the legislative materials accompanying the bill’s passage that its purpose was to expand the class of plaintiffs who can avail themselves of the Code’s warranty remedies and not to transform those remedies into a new tort cause of action (see, 1A ULA 558 [Master ed], UCC 2-318, Official Comment).
Moreover, the dissent’s novel proposal that the contract-based consumer-expectation test should be abandoned for the tort-based risk/utility approach even for contract-based warranty claims has not been embraced or even suggested by any of the risk/utility advocates that the dissent cites. For example, although the drafters of the Third Restatement have endorsed risk/utility analysis for design defect cases sounding in tort, they also have made clear that claims based on warranty theories are "not within the scope” of the newly drafted section and are, in fact, "unaffected by it” (Restatement [Third] of Torts: Products Liability [Tent Draft No. 2, Mar. 13, 1995] § 2, comment m, at 42). Further, the drafters have noted that "[w]arranty law as a body of legal doctrine separate from tort may impose legal obligations that go beyond those set forth” in the Restatement of Torts (id., comment q, at 46).
Similarly, while the commentators on which the dissent relies criticize the consumer-expectation-based tests for product defect and argue instead for the use of a risk/utility approach, their arguments are addressed to tort causes of action alone. One of the cited commentators, for example, argues that the consumer expectation test is a "blunt instrument” "when it comes to recognizing and maximizing the * * * goals, objectives, interests and values important to modern tort law” (Kennedy, The Role of the Consumer Expectation Test under Louisiana’s Products Liability Tort Doctrine, 69 Tul L Rev 117, 152 [emphasis supplied]). The same commentator also acknowledges that different standards might be appropriate for different theories of recovery where other objectives and values are pertinent (id.). Another commentator cited by the dissent contends that the risk/utility analysis should be used in place of a consumer-expectation test, but the argument is, once again, premised on the assumption that the latter "is not a tort way of looking at the problem of product defect” (Birnbaum, op. cit., at 646 [emphasis supplied]). This commentator also affirmatively criticizes courts that have failed "to separate conceptually the notions of strict liability, negligence, warranty, and absolute liability” (id., at 601).
*262 Significantly, the consumer-expectation test has its advocates as well as its critics. In fact, the proposed Model Uniform Products Liability Act has itself been criticized on the ground that it does what the dissent urges, i.e., it eliminates consumer expectation as a test for tort claims (Twerski and Weinstein, A Critique of the Uniform Products Liability Law — A Rush to Judgment, 28 Drake L Rev 221, 230-233; accord, 1 Frumer and Friedman, op. cit., § 1.08 [2] [c] [ii]). Such criticisms stem from recent expressions by "courts and commentators [of] considerable support for a threshold test which does not require that the complexities of risk-utility analysis be undertaken in every design defect case” (Twerski and Weinstein, op. cit., at 230-231). In view of the "rigors of the risk-utility test,” it has been suggested that it is "worthwhile” to retain the consumer-expectation test and "explor[e] solutions to [its] subjectivity problem” rather than simply abandoning it (id., at 232).[6]
In any event, while the critics and commentators may debate the relative merits of the consumer-expectation and risk/utility tests, there is no existing authority for the proposition that the risk/utility analysis is appropriate when the plaintiffs claim rests on a claimed breach of implied warranty under UCC 2-314 (2) (c) and 2-318. Further, the absence of authority for the dissent’s position is not surprising since the negligence-like risk/ utility approach is foreign to the realm of contract law.
As a practical matter, the distinction between the defect concepts in tort law and in implied warranty theory may have little or no effect in most cases. In this case, however, the nature of the proof and the way in which the fact issues were litigated demonstrates how the two causes of action can diverge. In the trial court, Ford took the position that the design features of which plaintiffs complain, i.e., the Bronco II’s high center of gravity, narrow track width, short wheel base and specially tailored suspension system, were important to preserving the vehicle’s ability to drive over the highly irregular terrain that typifies off-road travel. Ford’s proof in this regard was relevant to the strict products liability risk/utility equation, which required the fact finder to determine whether the Bronco II’s value as an off-road vehicle outweighed the risk of the rollover accidents that could occur when the vehicle was used for other driving tasks.
*263 On the other hand, plaintiffs’ proof focused, in part, on the sale of the Bronco II for suburban driving and everyday road travel. Plaintiffs also adduced proof that the Bronco II’s design characteristics made it unusually susceptible to rollover accidents when used on paved roads. All of this evidence was useful in showing that routine highway and street driving was the "ordinary purpose” for which the Bronco II was sold and that it was not "fit” — or safe — for that purpose.
Thus, under the evidence in this case, a rational fact finder could have simultaneously concluded that the Bronco II’s utility as an off-road vehicle outweighed the risk of injury resulting from rollover accidents and that the vehicle was not safe for the "ordinary purpose” of daily driving for which it was marketed and sold. Under the law of this State such a set of factual judgments would lead to the concomitant legal conclusion that plaintiffs’ strict products liability cause of action was not viable but that defendant should nevertheless be held liable for breach of its implied promise that the Bronco II was "merchantable” or "fit” for its "ordinary purpose.” Importantly, what makes this case distinctive is that the "ordinary purpose” for which the product was marketed and sold to the plaintiff was not the same as the utility against which the risk was to be weighed. It is these unusual circumstances that give practical significance to the ordinarily theoretical difference between the defect concepts in tort and statutory breach of implied warranty causes of action (see, e.g., McLaughlin v Michelin Tire Corp., 778 P2d 59, 66-67 [Wyo]; accord, 1 Madden, Products Liability § 5.11, at 160 [2d ed]).
From the foregoing it is apparent that the causes of action for strict products liability and breach of implied warranty of merchantability are not identical in New York and that the latter is not necessarily subsumed by the former. It follows that, under the circumstances presented, a verdict such as the one occurring here — in which the manufacturer was found liable under an implied warranty cause of action and not liable under a strict products cause of action — is theoretically reconcilable under New York law. Whether the particular verdict produced by the jury in this case was reconcilable in light of the charge and in accordance with case law applying rule 59 (a) of the Federal Rules of Civil Procedure is a question of Federal procedure which we are not well positioned to *264 resolve.[7] Hence, we construe the third certified question as posing only the theoretical question of whether this jury’s verdict is hypothetically possible under New York’s governing legal principles.
Accordingly, certified question No. 1 should be answered in the negative, certified question No. 2 in the negative and certified question No. 3 in the affirmative.

. Plaintiffs’ cause of action for negligence was also submitted to the jury. The claim was rejected on proximate cause grounds, and its disposition is not now in issue.

. Indeed, the statutory provision for personal injury recovery as an element of "consequential damages” (UCC 2-715 [2] [b]) makes it illogical to conclude, as the amicus Product Liability Advisory Council suggests, that the breach of implied warranty theory should be confined to recovery for economic loss (see generally, Bocre Leasing Corp. v General Motors Corp., 84 NY2d 685; Bellevue S. Assocs. v HRH Constr. Corp., 78 NY2d 282; Schiavone Constr. Co. v Elgood Mayo Corp., 56 NY2d 667, revg on dissent below 81 AD2d 221, 227).

. In design defect cases, the alleged product flaw arises from an intentional decision by the manufacturer to configure the product in a particular way. In contrast, in strict products liability cases involving manufacturing defects, the harm arises from the product’s failure to perform in the intended manner due to some flaw in the fabrication process. In the latter class of cases, the flaw alone is a sufficient basis to hold the manufacturer liable without regard to fault (see generally, Birnbaum, Unmasking the Test for Design Defect: From Negligence [to Warranty] to Strict Liability to Negligence, 33 Vand L Rev 593, 599-600).

. A warranty of fitness for ordinary purposes "does not mean that the product will fulfill [a] buyer’s every expectation” (1 White and Summers, *259 Uniform Commercial Code § 9-8, at 476 [Practitioner’s 3d ed]). Rather, it has been observed, such a warranty "provides for a minimal level of quality” (Skelton v General Motors Corp., 500 F Supp 1181, 1191, revd on other grounds 660 F2d 311).

. Significantly, the Model Act itself has been the subject of criticism (see, 1 Frumer and Friedman, op. cit., § 1.08 [2], at 1-164 — 1-165; Twerski and Weinstein, A Critique of the Uniform Product Liability Law — a Rush to Judgment, 28 Drake L Rev 221).

. The authors note that "[t]he fear that almost any defective product claim will pass under the rubric of consumer expectations can be dealt with by requiring that such expectations must be clearly and widely perceived to be attendant to the normal use of the product” (Twerski and Weinstein, op. cit, at 232).

. The dissent’s first argument (dissenting opn, at 265-266) focuses on whether the District Court’s charge to the jury on the question of "defect” created a basis for that jury to reach different conclusions on the design-defect and breach of implied warranty causes of action. However, matters such as the proper construction of a Federal court’s charge as given and the reconcilability of a jury verdict under that charge are not "questions of New York law” and are therefore not properly before us here (see, NY Const, art VI, § 3 [b] [9]; see also, 22 NYCRR 500.17).