2008 UT 84

**UTAH LOCAL GOVERNMENT TRUST, Plaintiff and Respondent,**

v.

**WHEELER MACHINERY CO. and Does 1 through 50, inclusive, Defendants and Petitioner.**

No. 20070084.

Supreme Court of Utah.

Dec. 12, 2008.

Scott M. Lilja, Nicole M. Deforge, Salt Lake City, Huey P. Cotton, Los Angeles, CA, for respondent.

Joseph C. Rust, Salt Lake City, for petitioner.

On Certiorari to the Utah Court of Appeals

NEHRING, Justice:

## INTRODUCTION

¶ 1 We are asked to determine whether the court of appeals erred in holding that the Utah Product Liability Act's two-year statute of limitations did not apply to the Utah Local Government Trust's claim against Wheeler Machinery Company. We hold that the court of appeals did not apply the correct test for determining whether ULGT's claim was a product liability claim. We therefore reverse and remand for application of the appropriate test.

1. Utah Local Government Trust is an entity that

## FACTUAL BACKGROUND

¶ 2 Wheeler Machinery Company contracted with the City of Hurricane for the purchase of two diesel generators to supply emergency power and to supplement the existing electric power supply during periods of peak demand. The initial bid included a list of items Wheeler would provide as part of its "Turn Key" bid. These items included the generators, fuel tanks, all other equipment needed to install the generators, enclosures for the generators, setup of all the supplied items, and testing and commissioning of the entire system. Sometime after awarding the initial bid to Wheeler, the City decided it would house the generators in a larger building, which it would build. As a result of these changes, Wheeler made several oral revisions to its bid.

¶ 3 Wheeler supplied all the materials for the system but paid Richard Carlson, an independent welding contractor, to fabricate the exhaust pipe for the generators. Mr. Carlson also welded the rain caps to the exhaust system when the exhaust system was installed. Although Mr. Carlson's fabrication of the exhaust pipe was paid for by Wheeler, the City had agreed to install the exhaust pipe through the roof, connect it to the mufflers, and attach the rain caps to the exhaust pipe.

¶ 4 The purpose of the rain caps was to prevent moisture from entering the system. To attach the rain caps, Mr. Carlson had to modify them by cutting half an inch off each side so they would fit within the framework supporting the generators' mufflers. This modification was not part of the original plan for installing the generators. Before the modified rain caps were installed, the City performed some work on other parts of the generator system as agreed to in an oral modification of the bid.

¶ 5 About seven months after the generators were installed, a fire in the generator building occurred, causing extensive damage to the City's building and equipment. The modified rain caps were identified as the cause of the fire.

¶ 6 On July 10, 2003, ULGT sued Wheeler.[1] It alleged that "one of the generators underwrites the construction and maintenance of

sold, supplied, assembled, and installed by Wheeler Machinery Co." caused the fire that damaged the City's property. Wheeler moved to dismiss the lawsuit. Wheeler argued that ULGT's complaint alleged a product liability cause of action and that the complaint had not been filed within the two-year product liability statute of limitations. ULGT amended its complaint and filed a motion in opposition to Wheeler's motion to dismiss. The district court denied Wheeler's motion to dismiss. Wheeler then moved for summary judgment. Wheeler reasserted its claim that ULGT's complaint alleged a product liability cause of action and should be dismissed because it was not filed within the two-year statute of limitations and claimed that it did not control the contractor who installed the rain caps. The district court found that if ULGT's claim had been a product liability claim, it would have been filed too late. For reasons the district court did not explain, the court did not rule on whether the claim actually was a product liability claim. The district court held that Mr. Carlson was acting under the direction of the City and not under the direction of Wheeler and granted summary judgment in favor of Wheeler. ULGT appealed to the court of appeals. On appeal, Wheeler again argued that ULGT's claim was a product liability claim and was barred by the statute of limitations. The court of appeals held that ULGT's claim was not a product liability claim because the installation of the rain caps occurred after the product was placed in the stream of commerce. It also held that there was sufficient evidence to create a question of fact regarding whether the City or Wheeler controlled Mr. Carlson. Wheeler petitioned for certiorari on the issue of whether the court of appeals applied the correct statute of limitations.

¶ 7 We granted certiorari and hold that the court of appeals applied the wrong test for determining whether ULGT's claim stated a cause of action in product liability. The appropriate test for determining whether ULGT's claim sounded in product liability is (1) whether the transaction primarily concerned a product and (2) whether the product was defective when it was sold. We reverse the determination of the court of appeals that ULGT's claim was not a product liability claim and remand for action consistent with this opinion.

## STANDARD OF REVIEW

■■ ¶ 8 "On certiorari review, we review the decision of the court of appeals, not the decision of the district court." *Nolan v. Hoopiiaina (In re Hoopiiaina Trust)*, 2006 UT 53, ¶ 19, 144 P.3d 1129. Whether the correct statute of limitations was applied is a question of law, which we review for correctness. *Id.*

## ANALYSIS

¶ 9 The product liability statute of limitations states that "[a] civil action under [the Product Liability Act] shall be brought within two years from the time the individual who would be the claimant in the action discovered, or in the exercise of due diligence should have discovered, both the harm and its cause." Utah Code Ann. § 78B–6–706 (Supp.2008). The Product Liability Act does not define what constitutes "a civil action under [the Act]."

■ ¶ 10 Although our statute does not define a product liability action, product liability encompasses all actions seeking money damages for injury to people or property resulting from defective products. *See* 1 David G. Owen et al., *Madden & Owen on Products Liability* § 1:5 (3d ed.2000). An action for damages resulting from a defective product can be based on claims of negligence, strict liability, tortious misrepresentation, and breach of warranty. *Id.* If the facts permit, a plaintiff can choose to bring claims under one or all of these theories in a single action. *Slisze v. Stanley–Bostitch*, 1999 UT 20, ¶ 8, 979 P.2d 317. Thus, by choosing one of the available legal theories, a claimant does not thereby foreclose bringing the claim under any other theory. *Id.* Because all of these claims share the common characteristic

various state-owned properties, including the Hurricane City power plant. Hurricane City is

ULGT's insured and the party that contracted with Wheeler Machinery Company.

of arising out of an injury caused by a product, they are often all alleged together.

¶ 11 Although the Product Liability Act does not define a product liability action, section 78B–6–703 provides some insight into the subject in its description of what may or may not be a defective product. The statute states:

> In any action for damages for personal injury, death, or property damage allegedly caused by a defect in a *product,* a product may not be considered to have a defect or to be in a defective condition, unless at the time the product was *sold* by the manufacturer or other initial seller, there was a defect or defective condition in the product which made the product unreasonably dangerous to the user or consumer.

Utah Code Ann. § 78B–6–703(1) (emphases added). What this statutory language makes clear is that in order to be governed by the two-year statute of limitations, the transaction must concern a product and that product must be defective when it is sold.

¶ 12 Thus, even if ULGT's claim were characterized as a claim for negligent manufacture of a product rather than for strict liability, the claim would still have to be brought within the product liability statute of limitations. *See Strickland v. Gen. Motors Corp.,* 852 F.Supp. 956, 959 (D.Utah 1994). The court of appeals acknowledged the broad application of the product liability statute of limitations, and ULGT agreed that if its claim alleged that negligence caused a product defect, its claim would be governed by section 78B–6–706. *Utah Local Gov't Trust v. Wheeler Mach. Co.,* 2006 UT App 513, ¶ 11, 154 P.3d 175.

¶ 13 Common to all of the claims that can be considered product liability claims is the fact that the damage was caused by a product. The law does not make clear, however, what constitutes a product and how the time of sale of that product is determined. Although the Restatement (Second) of Torts does not define product, the comments to its product liability section contain a list of items that are considered products. Restatement (Second) of Torts § 402A cmt. d (1965). One commentator has suggested that product was undefined in order to encourage and accommodate development of product liability law and to allow for the expansion of what might qualify as a product. David W. Lannetti, *Toward a Revised Definition of "Product" Under the Restatement (Third) of Torts: Products Liability,* 55 Bus. Law. 799, 808 (2000).

¶ 14 Defining product and sale under the Product Liability Act are issues of first impression for this court. Lacking guidance from our own statutes and cases, we turn for direction to the law of sister states and to other authoritative scholarship on the topic. We will first confront the dilemma of whether the subject of the transaction was a product or a service. Then we will turn to discerning the proper method for ascertaining the time of the sale.

## I. TEST FOR DETERMINING WHETHER A PRODUCT WAS THE SUBJECT OF THE TRANSACTION

¶ 15 In product liability actions it is often easy to determine whether a product is present and what it is. For example, if a plaintiff alleges that faulty wiring in a toaster caused a fire that damaged a kitchen, it is clear that the toaster is a product. In some cases, however, it is more difficult to determine whether a product is involved. For example, where a furnace and its installation are part of the same transaction and improper installation makes the furnace dangerous, it is not clear that all elements of the transaction fall within the scope of product liability. *See, e.g., O'Laughlin v. Minn. Natural Gas Co.,* 253 N.W.2d 826, 830–31 (Minn.1977) (holding that whether defective installation of a furnace was a sale of a good was a question for the jury). In some cases, however, installation, while clearly a service, is considered part of the product. *Id.*

¶ 16 We have previously noted that the Product Liability Act does not define product nor does it assist in determining whether a transaction that includes both a tangible item and a service will be treated as the sale of a product under the Act. We have held that a service alone cannot be considered a product. *See Alder v. Bayer Corp.,* 2002 UT 115, ¶ 23, 61 P.3d 1068. Additionally, no controlling

Utah case law describes a test for defining product in cases where there may be both a traditional tangible good sale and a service present in the same transaction. Despite this deficit in Utah law, case law from other states and definitions of analogous terms in areas of law that overlap with product liability can assist us in formulating a test for determining when a hybrid transaction constitutes a product liability claim.

## A. Tests Used by Other States

¶ 17 There are several different tests used by other courts to determine whether a product liability claim can be brought where a transaction is a hybrid of sale and service. Although cases discussing whether a hybrid transaction falls under product liability typically involve a plaintiff attempting to bring a product liability claim, the tests used in those cases are equally applicable where a defendant alleges that the plaintiff's claim is properly characterized as a claim for damages resulting from a defective product. *See, e.g., Alder*, 2002 UT 115, ¶ 23, 61 P.3d 1068 (denying a defendant's claim that moving and reinstalling a machine rendered the machine defective and therefore the claim should be governed by the two-year product liability statute of limitations). Additionally, although most often these tests are used to determine whether strict liability should apply, their focus is on determining the nature of the transaction; therefore, they are applicable to the question before us as well.

¶ 18 An important initial distinction often made in classifying hybrid transactions is whether the transaction was with a professional or a nonprofessional. Where a professional, such as a doctor, dentist, hospital, architect, or engineer, uses a defective item in their work, courts have refused to classify the action against the professional as a product liability action. *See* 2 David G. Owen et al., *Madden & Owen on Products Liability* § 20:3, p. 447 (3d ed.2000). For example, where a patient was injured by a hypodermic needle that broke as a dentist was injecting

anesthetic into her jaw, the court held that a product liability action could not be brought against the dentist because the dentist was in no better position to inspect and discover the defect than the plaintiff. *Magrine v. Krasnica*, 94 N.J.Super. 228, 227 A.2d 539, 543 (Law Div.1967).[2] Even where a transaction with a professional involves the sale of a faulty object, the professional is generally protected from a product liability claim. *See, e.g., Hoff v. Zimmer, Inc.*, 746 F.Supp. 872 (W.D.Wis. 1990) (holding that the doctor who used a faulty artificial hip was not subject to a product liability action). If it is not clear that a defendant is a professional, other aspects of the transaction besides the defendant's status must be examined to determine the nature of a hybrid transaction.

¶ 19 One test for determining whether a hybrid transaction should be treated as the sale of a product is whether the service aspect of the transaction occurred before the item being sold was placed in the stream of commerce. In *Erickson Air–Crane Co. v. United Technologies Corp.*, the Oregon Supreme Court held that the product liability statute of limitations only applied to "acts, omissions or conditions existing or occurring before or at the date on which the product was first purchased for use or consumption." 303 Or. 281, 735 P.2d 614, 616 (1987) (internal quotation marks omitted). In *Jamison v. Spencer R.V. Center, Inc.*, the stream of commerce test was applied to a hybrid transaction involving the sale and installation of a trailer hitch. 98 Or.App. 529, 779 P.2d 1091 (1989). The item being sold was the hitch, and the service being provided was installation of the hitch. The court held that when the service makes the product defective before the item is placed in the stream of commerce, the service becomes part of the product and is subject to the product liability statute of limitations. *Id.* at 1093. Additionally, the court held that the product enters the stream of commerce when it leaves the seller's hands, even if the contract for sale

---

**2.** In making this distinction, the *Magrine* court acknowledged that a typical retail seller also has little opportunity to discover defects in goods; however, they distinguished the plaintiff's attempt to bring a product liability action from

such cases by pointing out that strict liability claims against retailers draw in part from a legislative decision to adopt the UCC warranty action. *Magrine*, 227 A.2d at 543.

was executed before the service work was performed on the product. *Id.*

¶ 20 This test is highly dependent on the definition of entry into the stream of commerce. In the Oregon cases applying this test, however, the time that the product entered the stream of commerce was not at issue. *See generally Erickson Air–Crane,* 303 Or. 281, 735 P.2d 614; *Simonsen v. Ford Motor Co.,* 196 Or.App. 460, 102 P.3d 710 (2004); *Kambury v. DaimlerChrysler Corp.,* 185 Or.App. 635, 60 P.3d 1103 (2003); *Jamison,* 98 Or.App. 529, 779 P.2d 1091. No standard for determining when something enters the stream of commerce is ever discussed. In the absence of such a standard, whether an item entered the stream of commerce would be a factual question for the district court.

¶ 21 The court of appeals used the stream of commerce test in its resolution of this case; they failed, however, to articulate a test for placement into the stream of commerce. The court of appeals decided that the participation of the City in some of the installation indicated that the product was already in the stream of commerce. Since the question of when an item was placed in the stream of commerce is one of fact, had this been the correct test for determining whether a hybrid transaction was governed by the product liability statute of limitations, the court of appeals should have remanded the case to the district court for application of the stream of commerce test.

¶ 22 The stream of commerce test, however, is not the best test for determining whether a transaction is the sale of a product or the provision of a service. There are two reasons for this. First, the test does not address the true nature of the transaction; rather, it focuses on when the sale occurs. Second, the test is overly broad because it could expand the scope of product liability law to transactions that are primarily for services but happen to involve the sale of an object. For example, an electrician hired to repair a fuse box may have to replace a piece of wiring in order to repair the box. If the wire was installed incorrectly, rendering it defective, and if the customer paid for the repair after the completion of the installation,

the use of the wire could cause the entire transaction to be treated as a product liability action under the stream of commerce test. In contrast, had the electrician not needed to use a piece of new wiring, the transaction would have been a pure service transaction and the product liability statute of limitations would not apply. A test that would allow these two transactions to be treated differently does not further the goal of protecting people from dangerous objects.

¶ 23 The stream of commerce test is also at odds with the most frequently used test for classifying hybrid transactions, the essence of the transaction test. 2 David G. Owen et al., *Madden & Owen on Products Liability* § 20:3, p. 444 (3d ed.2000); *see also* Charles E. Cantu, *A New Look at an Old Conundrum: The Determinative Test for the Hybrid Sales/Service Transaction Under Section 402A of the Restatement (Second) of Torts,* 45 Ark. L.Rev. 913, 923 (1992–1993).

¶ 24 The essence of the transaction test is often applied in cases where the provision of medical service also involves the doctor or hospital dispensing a medical device. *See generally San Diego Hosp. Ass'n v. Superior Court,* 30 Cal.App.4th 8, 35 Cal.Rptr.2d 489 (1994) (holding that a physician who was injured while using a laser provided by the hospital could not bring a product liability action against the hospital because the hospital rendered service to physicians and patients and was not in the business of selling products); *Hector v. Cedars–Sinai Med. Ctr.,* 180 Cal.App.3d 493, 225 Cal.Rptr. 595 (1986) (holding that implanting a defective pacemaker was a service despite the device's defect). Courts in these cases have examined the nature of the relationship between the hospital and the patient and have found that the facts of the case support a finding that the transaction was for a service. In *Hector,* the court found that the fact that the hospital did "not stock, recommend, distribute or sell any pacemakers" supported a finding that it did not "play 'an integral and vital part in the overall production or marketing' of pacemakers" and therefore provided a service rather than engaged in a sale. 225 Cal.Rptr. at 599 (quoting *Silverhart v. Mount Zion Hosp.,* 20 Cal.App.3d 1022, 98

Cal.Rptr. 187, 190 (1971)). Generally, when courts must determine the essence of the transaction, they look at whether the defendant was "instrumental in moving a harm-producing 'product' through the stream of commerce" or "whether the chain of distribution ended effectively with the defendant who was more of a product user than a supplier." 2 David G. Owen et al., *Madden & Owen on Products Liability* § 20:3, p. 445 (3d ed.2000). If the defendant was more a product user than supplier, then the transaction was more likely a service.

## B. Standards From Analogous Doctrines

¶ 25 The theories of liability that are included within product liability law—negligence, strict liability, tortious misrepresentation, and breach of warranty—share the common characteristic of arising from an injury caused by a product. One of them, however, is unique because of its status as a contract cause of action. Breach of warranty is the general description of three causes of action that can be brought under the Uniform Commercial Code: breach of express warranty, breach of implied warranty of merchantability, and breach of warranty of fitness for a particular purpose. *See* 1 David G. Owen et al., *Madden & Owen on Products Liability* § 1:5, p. 17 (3d ed.2000). Including a contract claim in a family of claims that is otherwise composed entirely of tort claims appears misplaced at first, but further examination of these claims reveals that breach of warranty is one of the roots of strict product liability.

¶ 26 The tort of strict product liability evolved from the negligence cause of action and the contractual breach of warranty action. *Denny v. Ford Motor Co.*, 87 N.Y.2d 248, 639 N.Y.S.2d 250, 662 N.E.2d 730, 734 (1995). A negligence action has always been available as a potential claim against a seller of a faulty product, although all of the elements of a negligence claim had to be proven, including the point in the process of manufacturing the product where the seller's conduct fell below the required standard of care. This particular requirement presented a substantial obstacle to recovery, especially in the case of mass-produced products. 1

David G. Owen et al., *Madden & Owen on Products Liability* § 1:5, p. 21 (3d ed.2000). Contract warranty was the original cause of action for recovering for injuries caused by defective products without having to prove negligence, but privity of contract between the injured party and the seller of the product was required. *Denny*, 639 N.Y.S.2d 250, 662 N.E.2d at 734. In response to the barriers to recovery presented by negligence and breach of warranty, the concept of strict liability in tort developed. *See Greenman v. Yuba Power Prods., Inc.*, 59 Cal.2d 57, 27 Cal.Rptr. 697, 377 P.2d 897 (1963). Strict product liability combined the concept from negligence that an action can be brought when there is no privity with the contract requirement that the defendant be a seller of the type of product that caused the injury. By combining these two concepts, the new strict product liability cause of action discarded the privity requirement and the need to establish a breach in a standard of care.

¶ 27 The combination of tort and contract concepts to form a new theory of liability demonstrates the substantial overlap between the two doctrines where safety of a product is concerned. In *Davidson Lumber Sales, Inc. v. Bonneville Investment, Inc.*, we noted that in some cases, breach of warranty has been used to describe both the strict liability tort action and the contract action. 794 P.2d 11, 14 (Utah 1990). The ability to use breach of warranty to describe both a tort action and a contract action has tempted some jurists into applying the UCC statute of limitations to the tort portions of a plaintiff's complaint whenever the plaintiff alleges breach of warranty. *Id.* at 15–16. Conversely, some courts have argued for merging the contract cause of action into the strict liability cause of action. *See, e.g., Denny,* 639 N.Y.S.2d 250, 662 N.E.2d at 740 (Simons, J., dissenting). Both of these approaches, however, ignore the important conceptual differences between contract and tort that justify resisting their merger. *See id.* at 736 (explaining that contract law "directs its attention to the purchaser's disappointed expectations" and tort law "traditionally has concerned itself with social policy and risk allocation"). Additionally, application of the UCC statute of limitations to the tort portion

of a plaintiff's complaint has been specifically rejected by this court. *See Davidson,* 794 P.2d at 15–16.

¶ 28 In *Davidson,* Davidson Lumber brought an action for negligence, breach of implied warranty of merchantability and fitness for a particular purpose, indemnity, and contribution. 794 P.2d at 12. The action for which Davidson Lumber sought indemnity was a suit alleging strict product liability, breach of implied warranties of merchantability and fitness for a particular purpose, and negligence. *Id.* The trial court held that the UCC statute of limitations, Utah Code Ann. § 70A–2–725, barred Davidson Lumber's claims. *Davidson,* 794 P.2d at 12. We reversed, holding that the UCC statute of limitations only covers claims for damages recoverable under contract law and does not cover actions for personal injury or personal property damage. *Id.* at 16. Since only some of the claims for which Davidson Lumber sought indemnity were contract claims, we held that Davidson Lumber's claims for injury to persons or property were governed by the relevant tort statute of limitations. *Id.* at 18.

¶ 29 *Davidson* forecloses applying the UCC statute of limitations to ULGT's tort claim merely because it is alleged in the same complaint as ULGT's contract claim. The tort statute of limitations must be applied to the tort claim, and the contract statute of limitations to the contract claim. And we must still determine which statute of limitations is the relevant tort statute of limitations by determining what constitutes a product. However, the overlap between tort and contract pointed out in *Davidson* and the fact that contract and tort each contributed to the formation of the new theory of product liability indicates that elements of each body of law may be looked to in order to shape the law of product liability. In this instance, we can look to the UCC for assistance in defining product.

¶ 30 The UCC defines goods as "all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities ... and things in ac-

tion." Utah Code Ann. § 70A–2–105 (2001). In contrast to the absence of law giving direction to a court facing a product-service hybrid transaction under product liability law, Utah law does address hybrid transactions under the UCC. In *Beehive Brick Co. v. Robinson Brick Co.,* the court of appeals applied the predominant purpose test to determine the status of a hybrid transaction under the UCC. 780 P.2d 827, 832 (Utah Ct.App.1989); *see also* 1–3 *Commercial Law and Practice Guide* p. 3.02 (2007). The court stated that "if service predominates, and the transfer of title to personal property is only an incidental feature of the transaction, the contract does not fall within the ambit of [the UCC]." *Beehive Brick,* 780 P.2d at 832.

¶ 31 The predominant purpose test was also applied in *Neilson Business Equipment Center, Inc. v. Monteleone,* 524 A.2d 1172 (Del.1987). In that case, the Delaware Supreme Court addressed whether a contract for a turn-key computer system that included software specifically designed for Monteleone's business was a contract for goods or services. The court held that "[w]hen a mixed contract is presented, it is necessary for a court to review the factual circumstances surrounding the negotiation, formation and contemplated performance of the contract to determine whether the contact is predominantly or primarily a contract for the sale of goods." *Id.* at 1174. Using this test, the court found that where "[t]he hardware and software elements are combined into a single unit—the computer system—prior to sale[,] ... the computer system is predominantly 'goods.' " *Id.*

■ ¶ 32 The close association between tort and contract law in the area of product liability and the similarity of the *Beehive Brick* test and the product liability essence of the transaction test support using the *Beehive Brick* test to determine whether a hybrid tort claim concerns a product or a service. Therefore, it is appropriate to remand this case for a determination of the predominant purpose of the transaction at issue.

■ ¶ 33 Having described the test for when a hybrid transaction is considered the sale of a product, we will now address the

test for determining when the product was sold. Even if the transaction was for the sale of a product, a claim for product liability may not lie if the product became dangerous after it was sold.

## II. TEST FOR DETERMINING WHEN THE PRODUCT WAS SOLD

■ ¶ 34 Like the definition of product, the Utah Product Liability Act has spawned no judicial or legislative answer to the question of when a product is sold. Based on the above-discussed overlap between tort and contract, however, the UCC definition of sale can also be borrowed to provide a method to answer the timing question posed by Utah product liability law.

¶ 35 Under the UCC, a sale occurs with "the passing of title from the seller to the buyer for a price." Utah Code Ann. § 70A–2–106(1) (2001). Section 70A–2–401(2) states that "[u]nless otherwise explicitly agreed, title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods." *Id.* § 70A–2–401(2) (Supp. 2008). What constituted the performance with respect to physical delivery of the goods is an issue of fact that will depend on what the parties agreed to.

¶ 36 In this case, there is no explicit agreement on when title to the generators would pass to the City. Determining when the sale occurred will require knowing what Wheeler had to perform, what constituted delivery, and whether Wheeler met its performance requirements. Because the answers to these questions are not evident in the record, we remand for action consistent with this opinion.

## CONCLUSION

■ ¶ 37 The Utah Product Liability Act applies to actions, in both tort and contract, arising from injury caused by a defective product. The two-year product liability statute of limitations will only apply if a claim alleges damage from a product and if that product was defective when sold. Because the tort and contract actions contained within product liability share common roots, wheth-

er a transaction involves a product can be determined by using the UCC test for determining whether the transaction was for goods. In cases involving hybrid transactions, this is done by examining the predominant purpose of the transaction. The overlap between tort and contract also allows the UCC definition of sale to be used to determine when a product is sold. Because we find these two tests from the UCC to be the appropriate tests for resolving the issue of whether ULGT's claim is for product liability, we reverse the decision of the court of appeals and remand for the application of these tests.

¶ 38 Chief Justice DURHAM, Associate Chief Justice DURRANT, Justice WILKINS, and Justice PARRISH concur in Justice NEHRING's opinion.